**UNITED STATES of America, Plaintiff,**

v.

**UNION RAILROAD COMPANY, Defendant.**

**Civ. A. No. 15663.**

United States District Court
W. D. Pennsylvania.
March 12, 1958.

D. Malcolm Anderson, U. S. Atty., Pittsburgh, Pa., for plaintiff.

James Orr, Reed, Smith, Shaw & Mc-Clay, Pittsburgh, Pa., for defendant.

McILVAINE, District Judge.

In order that a better understanding of my formal findings of fact and conclu-sions of law might be accomplished, I think it would be advantageous to pref-ace them by a brief discussion.

In this case it appears that train loads of ore, coke, and other materials are brought from points other than the Ed-gar Thomson Works of the United States Steel Corporation, which is an integrated basic iron and steel plant, consisting of seven blast furnaces, a sintering plant, open hearth furnaces, slab mills, raw material handling facilities and various supporting operations, for processing at that plant. The coke is brought from Clairton some miles distant in cars which comprise a train and are part of a train movement. The limestone and other ma-terials such as dolomite are brought from North Bessemer in the same manner; tap cinders are brought in from Edgar Thomson Open Hearth. These materials are placed in an area of the Union Rail-road's yards, located within the Edgar Thomson Works, known as Port Perry. The cars are stored there, and when the industry orders a car of limestone, coke, or dolomite, the amount requested is taken to the requested place in the plant. After these cars are emptied, they are taken out of the plant proper and put in the adjacent yards. It is this latter operation which the Government urges is a train movement. Once out of the plant proper and in these yards, these cars are either sent back for more lime-stone, coke, or other materials or else otherwise disposed of.

The case has been exhaustively presented by the Government and rail-road counsel. All agree that the issue is whether this is a train movement or switching operation. In the words of the United States Supreme Court, "The controlling test of the statute's applica-ion lies in the essential nature of the work done * * *" United States v. Chi. Burl. & Q. R. R., 1915, 237 U.S. 410, 412, 35 S.Ct. 634, 636, 59 L.Ed. 1023.

After the Government had presented its case, it was agreed by all parties that a view would be beneficial to the Court as the trier of fact. Consequently, a view was arranged, and the Court at first

hand viewed the premises in question, and took a ride on a somewhat similar movement. This was of inestimable value.

In the words of another Circuit:

"After wrestling with it for some fifty years, courts have accomplished little other than to decide on the particular facts of the case whether the movement was that of a train within the meaning of the Act. It is apparent, therefore, that a holding in one case carries little weight as a rule for decision in another. Even when the facts of the case are disclosed, the question must depend largely upon the opinion or judgment of the court called upon to make a decision." United States v. Chicago, B. & Q. R. Co., 7 Cir., 199 F.2d 223, 226.

Our own Circuit has stated that the decision may be a jury question:

"Whether, therefore, the movement of the draft in question with air-hoses uncoupled was a violation of the Act depended upon whether the draft was a train and whether, accordingly, the movement was a train movement or a switching movement. There was evidence that the cars were loaded at one yard and made up into a draft for movement to another yard in a group of yards; that the yard of origin and the yard of destination, though almost if not entirely contiguous, were separate yards; that the train was to be hauled from one to the other, which, as one witness described it, was a 'dead haul'; that during the haul between yards nothing was to be done in a switching way and that on its arrival at the yard of destination it was to be broken up and its cars assigned to their proper trains.

"The evidence permitted conflicting inferences. There was enough evidence for the jury to determine as a fact either that the movement was of a train or of a draft for switching purposes." Philadelphia & R. R. Co. v. Bartsch, 3 Cir., 9 F.2d 858, 860.

■ Congress in its wisdom has seen fit to exempt switching operations from the power brake requirement of the Act. If in that exercise of their legislative power they acted wisely or not is not a question upon which this Court should or would express an opinion. But we do have a proper question before us. Is this a train movement or a switching operation? Applying my own experience to the evidence of this case, I find that this was a switching operation. The view of the premises strongly buttressed this opinion.

### Findings of Fact.

1. The Union Railroad Company (hereinafter called defendant) is a Class 1 switching railroad located entirely in Allegheny County, Pennsylvania. It runs from North Bessemer on the north to Mifflin and Clairton on the south. Other tracks lead off from about its center to Duquesne and Homestead.

2. Among the industries which it serves is the Edgar Thomson Works of the United States Steel Corporation, located on the north bank of the Monongahela River. The Edgar Thomson Works is an integrated basic iron and steel plant, consisting of seven blast furnaces, a sintering plant, open hearth furnaces, slab mills, raw material handling facilities and various supporting operations.

3. The railroad tracks in the Edgar Thomson Works are owned in part by the defendant and in part by the industry. All of the tracks are used to serve the industry and defendant's crews operate over all of them. There are various groupings of tracks in the Edgar Thomson Works area for the placing and holding of railroad cars to meet the needs of the industry.

4. Six of the blast furnaces are in a straight line, while the seventh is an isolated unit; one ore storage area and trestle (G trestle) serve the six furnaces, while number 7 furnace has its own ore storage area and trestle.

5. All of the cars loaded with materials for use in the blast furnaces are gathered on a group of tracks, called the Port Perry yard, to await industry's orders for movement and placement. Some of such cars, such as those containing tap cinder, come from within the confines of the Edgar Thomson Works and are placed in the yard by crews who, by reason of provisions in the pertinent collective bargaining agreements with defendant, are limited to working within the Edgar Thomson mill district. The other cars, containing such materials as coke, ore, limestone, and dolomite, are put in the Port Perry yard by main line division crews, who bring the coke from Clairton, the ore and limestone from North Bessemer (Bessemer and Lake Erie Railroad Company) and the dolomite from the Baltimore and Ohio interchange.

6. During normal, or 100% operation, the seven blast furnaces daily use 385 cars of materials; 138 of ore, 139 of coke, 43 of limestone, and 20 of miscellaneous materials. They are unloaded continuously around the clock; all but the ore is unloaded on the G, H, and I trestles, while the ore is unloaded adjacent to the trestles by a car dumper. Larry cars, owned and operated by the industry, feed the ore to the furnaces from the trestles. The defendant's mill division crews take the loaded cars to the ore storage areas and the trestles as industry orders them, doing the necessary switching, sorting, classifying and assembling so that they may be properly placed for unloading.

7. G trestle, which is 1,297 feet long, has three sets of tracks, number 1 being the closest to the furnaces and number 3 being the farthest away. The defendant's crew shove the loaded cars, sorted to position in accordance with the industry's orders, onto the trestle from the eastern end, placing the greatest number on number 1 and number 3 tracks, and leaving number 2 track comparatively free of cars for movement by the larry cars, which come onto, work and leave G trestle from the west end.

8. The principal function of the two larry cars, which normally work on number 2 track, is to receive ore and dump it into the proper bins under the trestle, but they also move cars on all three tracks, spotting them by means of a cable, so that their contents may be emptied into the proper bins. The larry cars also move sinter from the sintering plant to the furnaces. They receive their power from a third rail which carries 230 volts of electricity, which rail, on the trestle, is located between tracks numbers 2 and 3. In order to spot the cars over the proper bins, it is necessary to separate them and to pull the connected air hoses apart.

9. After the cars are empty, they are assembled and removed from the trestles and taken by another mill division crew around the lead track, a distance of 5,239 feet from the west end of G trestle to the Valley Inbound yard where they are set off on adjacent tracks. The empties are further switched by another crew, either for outbound movement or for subsequent use in the Edgar Thomson Works. It is impossible to so switch and classify the empties at a point closer to the G trestle because the congestion of the tracks in the mill area, necessitated by track requirements to serve the needs of the industry, does not permit earlier switching. The crew that delivers the empties to the Valley Inbound does not sort and classify them because of restrictions in the labor agreement. At times empties are dropped off en route in the Joe Wolfe yard.

10. On January 18, 1957, a mill division crew switched, gathered up and assembled a draft of forty-four empty cars from tracks numbers 1 and 3 on G trestle, picking up seventeen cars from number 1 and doubling to twenty-seven cars on number 3. Probably some empties had been taken from H and I trestles to G trestle before the tracks were doubled, and another crew took some cars from the eastern end of number 2 and put them on number 3 before the move was made. The cars on number 1 and number 3 tracks were in sev-

eral units, they having been separated for proper placement over the bins. The air hose was coupled in the first seventeen cars of the draft of forty-four before the double was made, but not in the remaining twenty-seven. It would not be safe to couple the air hoses while the cars were on the trestle, because of the open grill work underneath the cars and the proximity of the live third rail. In putting the forty-four cars together the crew did switching and assembling.

11. The mill division crew took the draft of forty-four cars along the lead track to Valley Inbound yard, setting the first twenty-two cars off on track number 3, the next three off on track number 1, and the remaining nineteen off on track number 2. Thereafter, following inspection by a car inspector, a main line division crew switched six of the cars from track number 3 to track number 1 and took two of them to a different group of tracks called the Rail yard; it switched the three cars from number 1 track to number 2 track and moved five cars from number 2 track to number 1 track. The eleven cars thus placed on number 1 track remained in the mill area for further movement by mill division crews in intra-plant use. The two cars taken to the Rail yard were subsequently returned to the Pennsylvania Railroad and the other thirty-two cars were taken to Clairton the following day by a main line crew.

12. While the track used from G trestle to Valley Inbound yard was at one time called the Valley Inbound main, the name is purely historical. For many years it has not been used as either an inbound or a main track; it is not a main track but is only a lead or yard running track. The move is made by a yard crew, without a caboose, without using or crossing at grade the tracks of another railroad, not on train orders or schedule but on orders of a yard master and under yard rules. The Government's principal witness characterized the track as a lead track, and relied solely on the designation of the track in an outdated timetable for calling it a main track without any consideration of its actual use, rescinding his pre-trial admission that it was not a main track.

13. The movement was made at a speed of approximately 6 miles per hour. Beginning at about 500 feet from the west end of G trestle, the tracks make a semi-circle to the left in a distance of approximately 1,200 feet. The maximum descending grade from G trestle in the first 1,700 feet is 2.24% for a very short distance, but the average descending grade is 1.17%. Because of the resistance caused by the curvature of the tracks and the inherent frictional forces in the cars, the effective grade around the curve is only 0.16%, a drop of less than 2 inches in 100 feet. Engine power is required to move cars around the curve. Actual tests proved that at all times an engine and from thirty-eight to forty-four cars can be stopped anywhere between the trestle and Valley Inbound yard within one-third the range of vision by use of the engine brake alone, well within the requirement of the applicable rule of the defendant that all movements of engines and cars, except those controlled by interlocking and automatic block signals, shall proceed under control, prepared to stop within one-half the range of vision. The comparable yard rule in general use on other railroads is that the engine will be prepared to stop within the scope of vision.

14. At the west end of the trestle, there is a foot walk, protected by a crossbar, that is used by mill employees. About 300 feet beyond is a vehicular road crossing used for intra-plant purposes, and about 600 feet beyond that is another vehicular crossing which is used only occasionally. The engineer has good visibility of all three crossings. All of the crossings are within the confines of the Edgar Thomson Works.

15. All of the cars coming into the Edgar Thomson Works, in accordance with the official listing for all railroads, are billed to Bessemer, Pennsylvania. Bessemer Yard includes several small groups of tracks as well as individual

tracks, all of which are used to serve the Edgar Thomson Works.

16. The movement of the forty-four cars from G trestle to Valley Inbound yard was not in transfer service as that phrase is understood by railroad men.

The cars that are handled from day to day from G trestle to Valley Inbound yard go to various places from that yard. The coke racks stay on defendant's line and are returned by main line crews of the defendant over main line tracks to Clairton for loading. The Bessemer and Lake Erie hoppers are delivered by other main line crews over defendant's main line to North Bessemer for further handling by Bessemer and Lake Erie Railroad. Cars that have come from the Pennsylvania Railroad, the Baltimore and Ohio Railroad or the Pittsburgh & Lake Erie Railroad are returned to them by main line crews. Cars requiring repairs are taken to the shop track in Bessemer Yard. Other cars remain in Bessemer Yard and are taken into the mill for further service.

17. The essential nature of the work being performed was an industrial switching operation within a part of the Bessemer Yard.

### Conclusions of Law.

1. The Court has jurisdiction of the parties and the subject matter.

2. The Union Railroad Company is a common carrier within the meaning of the Safety Appliance Act of 1903, and is subject to the provisions of Section 2 of that Act (45 U.S.C.A. § 9), as modified by the Interstate Commerce Commission in its order of June 6, 1910.

3. The movement of forty-four empty cars from G trestle to the Valley Inbound yard on January 18, 1957, was a switching operation and not a train movement within the meaning of the Safety Appliance Act, and defendant was not required to have air in 85% of the cars.

4. The complained of move was not in violation of the Safety Appliance Act and the case will be dismissed.

Order.

And Now, to wit, this 12th day of March, 1957, it is ordered and directed that judgment be entered in favor of the defendant, Union Railroad Company.